# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

IN RE HAGUE APPLICATION:

PAPA ABDOUL SELLY DIALLO,    )
    )
    Petitioner,    )
    )
    vs.    )    **Case No. 4:07CV1125SNL**
    )
MELINDA MARIE BEKEMEYER n/k/a    )
MELINDA MARIE BUMGARDNER,    )
    )
    Respondent.    )


## MEMORANDUM AND ORDER

This matter is before the Court on the Petitioner's petition for the return of his two (2)

minor children under the Hague Convention (#1), filed June 11, 2007. On or about December 4,

2005 Respondent, without the knowledge or permission of Petitioner, took their two (2) minor

children from New Zealand (where they all had been residing together for over 4 years) to

Hawaii, then to The Netherlands, and finally, to the United States with the intention of not

returning to New Zealand with the children. Petitioner seeks the return of the children to New

Zealand and jurisdiction of this matter regarding custody issues to be adjudicated by the New

Zealand courts. Petitioner has filed this action under the Hague Convention on the Civil Aspects

of International Child Abduction and the International Child Abduction Remedies Act (ICARA),

42 U.S.C. §11601-11610.[1]

---

[1]Presently pending before the Court in connection with the petition are the following
motions: Petitioner's motions for summary judgment (#16), filed July 24, 2007; *in limine* to
exclude evidence outside the scope of inquiry (#38), filed July 27, 2007; for sanctions against
Respondent (#39), filed July 27, 2007; *in limine* to exclude expert testimony (#41), filed July 27,
2007; to strike the first affidavits of Melinda Bekemeyer and Cliff Bumgardner pertaining to
Netherlands' Court Decision (#42), filed July 27, 2007; *in limine* to exclude affidavits submitted

The matter is before me on the emotionally charged issue of whether the children should be returned to New Zealand wherein the New Zealand courts will decide the custody matters, or allow the children to remain in the United States (i.e.; Missouri) under the jurisdiction of this Court. After a four (4) day hearing, including a teleconference with the Petitioner and legal expert(s) in New Zealand[2], the Court concludes that the law requires the children to return to New Zealand and the jurisdiction of the New Zealand courts.

This case is a rancorous dispute between the parents of two (2) minor children[3] regarding whether the children should be allowed to stay in the United States or be returned to New Zealand and subject to a custody hearing in that country. On July 31 through August 2, 2007, a hearing took place before this Court. At the conclusion of the hearing, all parties were permitted to file post-hearing briefs, and this matter is now ripe for disposition.

After careful consideration of all objections to exhibits and testimony taken with the case, all said objections are hereby overruled, and all exhibits offered into evidence at the hearing are received into evidence. All testimony will be considered by the Court and given its due weight. This Court, having now considered the pleadings, the testimony of witnesses, documents in evidence, and any other evidentiary materials submitted for the Court's consideration, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law. Said factual findings are derived from the record in this case, including all previously mentioned

by Respondent; *in limine* to exclude evidence outside the scope of these proceedings, bad acts, or evidence regarding relationship with ex-wife Susan Bennett a/k/a Susan Diallo (#44), filed July 27, 2007; and Respondent's motions for judgment on the pleadings or in the alternative, to strike (#19), filed July 24, 2007; for sanctions against Petitioner for tampering with witnesses (#21), filed July 24, 2007.

[2]July 31 - August 2, 2007.

[3]For protection of the minor children's privacy, the Court will refer to them as "K" and "B".

testimony and documentary evidence, as well as the lengthy transcript of the four (4) day hearing filed in this cause of action.

## **FINDINGS OF FACT**

Petitioner is currently a Sengalese citizen residing in New Zealand. Respondent is a United States citizen currently residing in the United States; i.e., Ballwin, Missouri. The children, K and B, are currently residing with the Respondent in the United States.[4]

Petitioner and Respondent first met on or about October 31, 1999 in California. Shortly thereafter, Respondent became pregnant with K. K was born in California on August 23, 2000. At the time of K's birth, Petitioner and Respondent both lived in California. Although the record is unclear as to actual living arrangements at this time, the parties did share common mailing addresses and held themselves out as a "couple".[5]

In January 2001, Petitioner, Respondent, and K moved together to New Zealand. Respondent had sought and obtained a two-year contract as a speech therapist. Petitioner intended to obtain part-time work and continue his educational studies. Initially, Petitioner and Respondent planned to stay in New Zealand for only the duration of the Respondent's two-year contract, but Respondent renewed the contract for an additional two (2) years.

Upon arriving in New Zealand, the first of several residences was leased jointly by Petitioner and Respondent. Although the parties maintained bank accounts in the United States, they had joint bank accounts in New Zealand, and jointly made significant purchases, including two (2) motor vehicles while in New Zealand. They regularly referred to each other as "partner"

---

[4]K is a United States citizen; B is both a United States citizen and a New Zealand citizen.

[5]Respondent's 2000 Federal and California state tax forms listed Petitioner as a "spouse" and a joint address as place of residence. Furthermore, at least one (1) lease, while in California, was signed jointly by the Petitioner and Respondent.

and /or "spouse"; and held themselves out to the public as a "married couple". In 2001, Petitioner and Respondent (for themselves and on behalf of K) sought and was granted permanent residency by New Zealand. On the Respondent's application for permanent residency, she referred to the Petitioner as "my husband". They regularly engaged in sexual intercourse, hosted and attended social events as a couple, resided in the same residence, and in August 2004 had a second child together, B. Petitioner is listed as the natural father on both K's and B's birth certificates.

Upon arrival in New Zealand, and throughout their stay in New Zealand, the Petitioner was the primary caregiver for the children while Respondent worked full-time. When the children were not in school, he was responsible for their everyday care, including but not limited to, meals, naptime, playtime, bathtime, etc. Petitioner was actively involved in the housekeeping and general maintenance of their residences. Petitioner and Respondent were both actively engaged in their children's school activities, field trips, and parent-teacher conferences.

Except for a five-month period from November 2004 to April 2005, Petitioner and Respondent, along with the children, all lived together continuously in New Zealand from January 2001 until December 2005. In the latter part of 2004, K developed urinary problems which required medical treatment by a pediatric urologist. Given some uncertainties regarding pediatric urology care for K in New Zealand, Petitioner and Respondent decided to seek medical care for her in the United States. Ultimately, K's left kidney was removed successfully, she received post-operative care, and returned to New Zealand in April 2005. Until December 2005, she received adequate medical care in New Zealand and there was no evidence presented to the Court of any further medical problems concerning K.

It was undisputed by the Petitioner that while living in New Zealand he was a habitual user of marijuana. The credible evidence indicates that his usage was outside of the home, and not in

the presence of the children. Petitioner testified that he presently has stopped using marijuana and will continue ceasing its use if and when the children return to New Zealand.

There was hotly disputed testimony between the Petitioner and the Respondent and members of her family regarding possible physical abuse towards the Respondent by the Petitioner. The credible evidence before the Court indicates that there were times of stress in the Petitioner and Respondent's relationship, primarily due to his marijuana use. No evidence was presented at the hearing which even suggested that either child was subjected to any physical or sexual abuse by either parent.

On December 4, 2005 Respondent told the Petitioner that she and the children were going to a barbeque at a friend's house and would return later in the afternoon. Instead, Respondent took the children and together they flew to Hawaii. A mutual friend called Petitioner the next day to inform him where Respondent and the children were located. Several days later, Respondent called the Petitioner to tell him that she and the children were in Hawaii for an indeterminate amount of time. A series of discussions then ensued as to the Respondent's intentions regarding herself and the children. At no time did Petitioner consent or acquiesce to the children's removal and retention from their residence in New Zealand. At the time of the children's removal from New Zealand, Petitioner did not have a valid passport or visa to permit him to travel to the United States.

From Hawaii, the Respondent took the children to live in Ballwin, Missouri with herself and her parents. Although at first Respondent allowed Petitioner to have telephone contact with the children, shortly after arriving in Missouri, she cut-off all telephonic contact between the Petitioner and the children.[6]

---

[6]There was no testimony as to contact via the postal mails or e-mail.

Petitioner initiated Hague Convention proceeding by filing an application for assistance with the New Zealand Central Authority in mid-January 2006. On or about March 23, 2006, the National Center for Missing and Exploited Children (NCMEC) received an application from the New Zealand Central Authority for the return of K and B to New Zealand pursuant to the Hague Convention. On or about April 11, 2006 the NCMEC sent a letter to Respondent asking her to voluntarily return the children to New Zealand. On or about April 24, 2006, Respondent's United States attorney, Paul Schramm, responded to the NCMEC's request with a refusal to comply. In May 2006, the NCMEC secured the services of a pro-bono attorney to assist the Petitioner in his attempts to facilitate the return of the children to New Zealand.

In the Spring of 2006 Respondent began to actively search for employment outside the United States, including Chile. In June 2006, Respondent moved with the children to The Netherlands wherein she secured employment (a two-year employment contract) and a residence; and enrolled the children in school. Petitioner was unaware of the children's move to The Netherlands until August 2006. At that time, the NCMEC, on behalf of the Petitioner, forwarded the Petitioner's Hague application to the Central Authority of The Netherlands.

On or about September 8, 2006 Respondent received a letter from the NCMEC once again asking her to voluntarily return the children to New Zealand; otherwise, Hague proceedings would be initiated. Respondent sought and received additional time to respond to the NCMEC's letter. On September 26, 2006 Respondent, through her United States attorney, submitted a letter raising various allegations against the Petitioner. Meanwhile, Respondent secured the services of a Dutch attorney, Carlo Leifting, to represent her. On or about November 16, 2006, Mr. Leifting faxed a letter to the Central Authority of The Netherlands stating that the Respondent was refusing to voluntarily return the children to New Zealand.

On or about December 1, 2006 the Amsterdam District Court Youth Unit (Amsterdam Court) received the Petitioner's Hague Petition, filed by the Central Authority of The Netherlands; whereupon Respondent and her Dutch counsel were served with a copy. In response to the filing of the petitioner, Respondent's Dutch counsel submitted a Writ of Defense on December 12, 2006. On December 19, 2006 Respondent, through her Dutch counsel, submitted numerous additional exhibits in support of her Writ of Defense. In responding to the Petition, Respondent specifically invoked Article 13(b) by arguing that the return of the children would pose a grave risk of physical and psychological harm to them. In support of this assertion, she alleged numerous specific instances of misconduct and "bad behavior" on the part of the Petitioner in fifteen (15) separately numbered paragraphs. She then supplemented these allegations with numerous exhibits. On or about December 20, 2006 Respondent was served with a summons notifying her that the Amsterdam Court would hold a hearing on the Hague Petition on January 16, 2007.

On January 16, 2007 the Amsterdam Court held a hearing in which Respondent and her counsel attended. According to documentation by the Dutch Ministry of Justice, a paralegal Clifford Bumgardner[7] working in association with Mr. Liefting, acted as the official translator for the Respondent during the hearing. Mr. Bumgardner was chosen by Respondent and her counsel, and at no time during the proceeding did Respondent or Mr. Bumgardner[8] raise any concerns about understanding the proceedings. The Amsterdam Court heard testimony and asked questions of the Respondent. At that time, Respondent argued to the Amsterdam Court that the children were "well-settled" in The Netherlands; thus, were not habitual residents of New

---

[7] Mr. Bumgardner is presently the Respondent's husband.

[8] Evidently, Mr. Bumgardner is fluent in both Dutch and English.

Zealand. The credible evidence before the Court indicates that the hearing was conducted in accordance with The Netherlands' law and custom.

The Amsterdam Court considered the Respondent's claims/allegations of abuse, infidelity, neglect, and drug use and rejected same finding that Respondent had failed to show that the children would be exposed to a grave risk of harm if returned to New Zealand. On January 22, 2207 having found that for Petitioner, the Amsterdam Court ordered the immediate return of the children to New Zealand. Respondent and her attorney appealed the Amsterdam Court's decision by again asserting an Article 13(b) defense of grave risk of harm. Respondent filed an additional thirty-six (36) exhibits, along with the trial court submissions.

Meanwhile, Respondent made plans for the removal of the children to the United States by her parents. In a letter dated February 9, 2007 Respondent informed the United States Consulate that the children had to return to the United States for medical reasons; i.e. the removal of K's kidney. In fact, K's kidney had already been removed almost two (2) years prior, and neither child was in need of medical attention in the United States. Respondent arranged for her parents to come to The Netherlands and accompany the children back to the United States.

On February 16, 2007 Respondent was arrested and held in custody by Dutch police on suspicion of violating the Amsterdam Court's order and improper removal of minors from a parent. On February 19, 2007 Respondent was released on probation on the express conditions that she not leave The Netherlands and that she cooperate fully with the Dutch Central Authority in arranging the return of the children to New Zealand no later than April 15, 2007. Instead, shortly after her release, Respondent and Mr. Bumgardner left The Netherlands and flew to the United States. On February 28, 2007, within a week of arriving in the United States, they were

married. At the time of this Court's hearing, the Respondent, Cliff Bumgardner, K, and B were all living with the Respondent's parents in Ballwin, Missouri.

On or about March 2, 2007, NCMEC received correspondence from The Netherlands Central Authority requesting assistance in locating the children who were now missing from The Netherlands. On March 5, 2007, the Court of Appeals in Amsterdam, Family Division (Appellate Court) held a hearing on the Respondent's appeal. Although Respondent's Dutch counsel was present, Respondent, by her own choice and actions, was not present for the hearing. The Appellate Court upheld the Amsterdam Court's decision in all respects, and again ordering the return of the children to New Zealand.

On March 5, 2007, an international search/arrest warrant was issued for the Respondent's arrest.[9]

On or about March 17, 2007 NCMEC received back from The Netherlands Central Authority the Petitioner's original Hague Petition (dated January 17, 2006), for the return of K and B to New Zealand. On or about May 2, 2007, due to the combined efforts of the Missouri Missing Persons Clearinghouse, the U.S. Postal Inspector, the U.S. Secret Service, the New Zealand Central Authority, The Netherlands Central Authority, the California Attorney General, the NCMEC was able to locate the children in Ballwin, Missouri. On or about May 7, 2007 NCMEC was able to obtain the services of present counsel for Petitioner to represent his interests before this Court. The pending Petition for Return of Children was filed with this Court on June 11, 2007.

---

[9]As far as the Court is aware, this arrest warrant is still outstanding.

While Petitioner and the Dutch authorities were looking for the children, Respondent, on March 12, 2007, filed an action in the Circuit Court for St. Louis County seeking a declaration of paternity, child support (ostensibly directed to the Petitioner), and sole custody of the children. In her petition, Respondent misinformed the state court that the children were residents of St. Louis County, when in fact, the children had only been in the United States (Missouri) for approximately four (4) weeks. Respondent also failed to inform the state court of the ongoing Hague Convention dispute, the two (2) prior Netherlands courts' decisions ordering the return of the children to New Zealand; or the international arrest warrant for her arrest outstanding at the time.

The St. Louis County action was dismissed on August 30, 2007; and Respondent's motion to reopen the case was denied on September 28, 2007.

Diallo seeks the return of the children to New Zealand and further legal proceedings regarding any custody issues to be heard by a court in New Zealand. Bekemeyer[10] seeks to keep the children in the United States and have a United States court (whether federal or state) adjudicate any custody issues.

## APPLICATION OF THE HAGUE CONVENTION AND ICARA

The Hague Convention on the Civil Aspects of International Child Abduction was adopted " to secure the prompt return of children wrongfully removed to or retained in an contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Article 1.; *see also*, Nunez-Escudero v. Tice-Menley, 58 F.3d. 374, 375 (8th Cir. 1995). According to the

---

[10]Although the Court is well aware of the Respondent's recent change in marital status and name; for consistency, the Court will refer to her by her maiden name as that is the name which appears on most of the documents before this Court.

Convention, a child is wrongfully removed or retained when, in violation of the exercise of the custody rights of another person under the law of the place where the child was habitually resident, they are taken from, or not returned to, that place. In 1988, the United States implemented the Hague Convention (aka the Treaty) by passing the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§11601 *et. seq.* The purpose of ICARA is to establish "legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights." 42 U.S.C. §11601(a)(4). United States district courts have concurrent original jurisdiction over actions arising under the Hague Convention. 42 U.S.C. §11603. However, the scope of both the Treaty and ICARA is extremely narrow.

> "Both the Treaty and ICARA require the inquiry into a child abduction claim to be a narrow one. Indeed, Congress provides that courts are empowered `to determine only rights under the Convention and not the merits of any underlying child custody claims.' 42 U.S.C. §11601(b)(4). Similarly, Article 19 of the Treaty cautions that, `[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.'"

Fawcett v. McRoberts, 168 F.Supp.2d. 595, 599-600 (W.D.Va. 2001)(external citations omitted). Both the United States and New Zealand are signatories to the Convention as of 1991.

Article 12 of the Hague Convention addresses procedures to effectuate the return of a wrongfully removed child. It specifically provides for judicial and administrative authorities having the power to order a child's return upon a finding that the child's removal has been "wrongful". The Hague Convention defines wrongful removal as:

> "The removal or the retention of a child is to be considered wrongful where - - a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually

exercised, either jointly or alone, or would have been so exercised
but for the removal or retention."

Id., at Article 3.  The United States has adopted this definition in its own analysis of "wrongful

removal":

>"Generally speaking, `wrongful removal' refers to the taking of
>a child from the person who was actually exercising custody of the
>child.  `Wrongful retention' refers to the act of keeping the child
>without the consent of the person who was actually exercising custody.
>The archetype of this conduct is the refusal by the noncustodial parent
>to return the child at the end of an authorized visitation period."

U.S. Department of State, Legal Analysis, Hague International Child Abduction Convention, 51

Fed. Reg. 10494, 10503 (March 26, 1986).

"Habitual residence" is not specifically defined within the language of the Hague

Convention or ICARA.  However, the text of the Hague Convention clearly provides a narrow

timeframe in which to determine a child's habitual residence: the point in time "immediately before

the removal or retention."  19 I.L.M. 1501, Art. 3.  It is the child's residence and not one or the

other of the parents' residence that is determinative.  Id.  A person can only have one habitual

residence and it should not be confused with domicile.  Silverman v. Silverman, 338 F.3d. 886,

898 (8th Cir. 2003)(citations omitted).  A habitual residence has a settled purpose, which does not

necessarily equate to staying in a particular location forever, but that the family's living

arrangement has a sufficient degree of continuity to reasonably be viewed as "settled".  Id.

Habitual residence may only be altered by a change in geography and the passage of time.  Id.

If a petitioner prevails in a lawsuit brought under the Hague Convention and the child is

found to have been wrongfully removed or retained, the district court shall order the return of the

child immediately to the place of the child's habitual residence.  19 I.L.M. 1501, Art. 12.  In

addition, the prevailing petitioner may be able to recover certain costs and fees associated with the

litigation.  42 U.S.C. §11607.

The Hague Convention only addresses the jurisdiction of a court to decide whether a child has been wrongfully removed or retained; and does not provide any foundation for a court to address custody issues. "Article 19 of the Convention and ICARA do not allow a court applying the Convention to adjudicate the merits of any underlying custody claims. Rather, in an action for the return of a child to the habitual residence, a petition must prove only that the child was removed or retained `wrongfully' as the term is defined in Article 3 of the Convention." Rydder v. Rydder, 49 F.3d. 369, 372 (8th Cir. 1995). Thus, a district court may not consider evidence pertaining to the merits of custody such as who is the better parent or what are the best interests of the child(ren).[11] Nunez-Escudero, at 376.

Of the four (4) affirmative defenses available to prevent the return of a child, only one is at issue here; in order to prevent the return of a child to his/her place of habitual residence, the respondent must prove, by clear and convincing evidence, that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 19 I.L.M. 1501, Art. 13(b); 42 U.S.C. §11603(2)(A). Two types of "grave risk" are appropriate under Article 13(b): "sending a child into a `zone of war, famine or disease', or in cases of serious abuse or neglect." Silverman, at 900 citing Friedrich v. Friedrich, 78 F.3d. 1060, 1069 (6th Cir. 1996). However, a court applying the Hague Convention should narrowly construe the exceptions to the return of a child. Rydder, at 372.

Firstly, the Court will address the issue of The Netherlands' judicial decisions finding that the Respondent had wrongfully removed the children from New Zealand and ordering her to return the children forthwith. Petitioner argues that these judicial decisions are entitled to full

---

[11]This is not the same issue as will later be addressed as the "grave risk of physical or psychological harm" defense raised by the Respondent.

faith and credit, while Respondent argues that the proceedings were judicially infirm and denied her due process.

After careful consideration of the matter, the Court finds that The Netherlands' judicial proceedings were not judicially infirm and that Respondent's basic due process rights were accorded proper protection.

The Respondent was afforded a full and fair opportunity to litigate her Hague Convention case before two (2) fully competent judicial tribunals. At all times, she was represented by counsel, submitted extensive materials in her defense to both the trial court and the appellate court, and was present at the trial court hearing (and evidently chose not to be at the appellate court hearing by fleeing the country).

The Netherlands is a signatory to the Hague Convention (September 1, 1990) and by all accounts applied the same law on international child abduction that this Court is applying presently. Each and every issue present before this Court was presented to both Netherlands' courts; fully litigated, and a final decision rendered on the merits. The Court notes that for the first time, Respondent is making new allegations regarding supposed instances of abuse and neglect by the Petitioner. Nowhere in any of her communications with The Netherlands courts, in any of the numerous exhibits filed on her behalf with said courts, or during any of her testimony before the trial court, did she raise any of these new allegations. Given that she had both U.S. counsel and Dutch counsel, raised fifteen (15) specific Article 13(b) allegations in response to the Petitioner's Hague Petition, attended the trial court hearing, and submitted an additional thirty-six (36) exhibits to the appellate court; the timing of these new allegations are extremely suspect.

The United States courts have consistently found The Netherlands courts to be courts of competent jurisdiction. <u>Van Den Biggelaar v. Wagner</u>, 978 F.Supp. 848, 855-56 (N.D.Ind.

1997)(citations omitted). The evidence before this Court equally persuades it to find both The Netherlands trial court and appellate courts to be courts of competent jurisdiction in addressing the Petitioner's Hague Convention matters. The fact that the Dutch Court procedures may differ in some respects from standard United States courts' procedures does not alter this finding because "the fairness of the Dutch court procedures does not depend on its similarity or dissimilarity with United States court procedure but only upon its basic fairness." Van Den Biggelaar, at 856 *citing* Ingersoll Milling Machine Co. v. Granger, 833 F.2d. 680, 688 (7th Cir. 1987). Respondent was afforded a full and fair opportunity to present her case, not once but twice, and there is nothing before this Court which indicates in any way that the fairness of the Dutch court procedures is in question.

Under the express provisions of ICARA, judgment/decisions rendered in Hague Convention proceedings ordering or denying the return of a child are entitled to full faith and credit.

> "Full faith and credit shall be accorded by the courts of
> the States and the courts of the United States to the judgment
> of any other such court ordering or denying the return of a
> child, pursuant to the Convention, in an action brought under
> this chapter."

42 U.S.C. §11603(g). This "full faith and credit" clause is equally applicable to foreign judgments as well, provided that the foreign decision was not jurisdictionally deficient under the Convention. *See*, Diorinou v. H.E. Mezitis, 132 F.Supp.2d.139, 144 (S.D.N.Y. 2000); Morton v. Morton, 982 F.Supp. 675, 685 (D.Neb. 1997).

Having found that The Netherlands courts' decisions were not jurisdictionally deficient and that Respondent's due process rights were adequately protected, said decisions are entitled to full faith and credit in this proceeding. In any event, this Court. as a matter of comity and *res*

*judicata*, adopts The Netherlands' courts' determinations that New Zealand was the habitual residence of both K and B, that Respondent wrongfully removed them from New Zealand in violation of Petitioner's custody rights pursuant to New Zealand law, and that said children must be returned to New Zealand. *See*, Diorinou, at 145; Morton, at 685-86.

*Assuming arguendo* that this Court did not accord The Netherlands courts' decisions full faith and credit, this Court would still find that New Zealand was the habitual residence of both K and B, that Respondent wrongfully removed them from New Zealand in violation of Petitioner's custody rights pursuant to New Zealand law, that Respondent has failed to establish any risk of grave danger to the children upon their return to New Zealand, and that the children must be immediately returned to the jurisdiction of the New Zealand courts.

Diallo must prove by a preponderance of the evidence that New Zealand was the children's habitual residence before Bekemeyer removed them to the United States, and that he was exercising his custodial rights over the children under New Zealand law at the time of their removal. Once Diallo has made such a showing, the children must be returned to New Zealand unless Bekemeyer establishes, by clear and convincing evidence, that returning the children to New Zealand would expose the children to a grave risk of physical or psychological harm or otherwise place the children in an intolerable situation.

The children's habitual residence is clearly New Zealand. From 2000 until the Respondent removed them in December 2005, except for a medical visit to the U.S. for approximately four months, the children lived in New Zealand engaging in the full spectrum of normal childhood activities: attending school, participating in extra-curricular activities, hanging out with friends, engaging in sports activities, and generally enjoying the social and cultural environment of New Zealand. Whatever discussions ensued between the Petitioner and Respondent about some future

move to the United States were general in nature and do not denote any specific, well-planned permanent move. If anything, the evidence shows that Respondent was the only one to seriously give thought to moving back to the U.S. and did so because of her belief that Petitioner was conducting an affair with another woman. The evidence shows the "intent" to return to the United States and her parents' home to be her "intent" only since at the time she arranged the flight to Hawaii, Petitioner did not have a valid visa or passport to return to the U.S., and there was no evidence to indicate that he would possess one in any specific time-frame.

The Court further finds that Petitioner Diallo has established that he was exercising his custodial rights over his children at the time of their removal by Respondent to the United States. The Court finds that under the New Zealand Care of Children Act, Diallo and Bekemeyer were in a *de facto* relationship which provides both parties with guardianship and custody rights. Petitioner and Respondent were living together in the same household, engaging in a sexual relationship, socializing and entertaining as a "couple", sharing responsibility for the care and upbringing of the children, sharing in the domestic responsibilities of the household, and sharing in the costs of maintaining the household and raising the children. Under New Zealand law, Petitioner and Respondent were in a *de facto* relationship at the time of K's birth, as well as at the time of B's birth, and up to the time that Respondent removed both children from New Zealand.[12]

The evidence clearly shows that Petitioner was exercising his custody rights over the children at the time of their removal. He was actively involved in their daily care, in their

---

[12]Although not necessary in light of the Court's finding that the evidence was more than sufficient to establish that Petitioner and Respondent were in a *de facto* relationship under New Zealand law during the relevant time-period, the Court also finds that the evidence established, in the alternative, that Petitioner has inchoate rights of custody under New Zealand law.

education, and in the course of activities outside the home.  In many respects, he was an "at-home Dad".

Although Respondent primarily seeks the retention of the children in the United States by asserting the "grave risk of harm" affirmative defense, the Court will address briefly the contention that the children are now "well-settled" in the United States.

Respondent argues that the children are now attached to her parents, that she is married and has familial support in the United States, that the children attend school here, have friends here, and have been baptized and are being raised in a Christian faith here.  That is all well said and good, but the United States cannot become their habitual residence because Respondent wrongfully removed them here, detained them here and in The Netherlands, and now due to the passage of time by thwarting the Petitioner's valid and legal attempts to have the children returned to New Zealand, seek a court finding that the children are "well-settled" in their new environment in the United States.  A parent cannot create a new "habitual residence" by the wrongful removal and sequestering of a child.  <u>Diorinou</u>, at 143.  "A removing parent `must not be allowed to abduct a child and then - when brought to court - complain that the child has grown used to the surroundings to which they were abducted.'" <u>Silverman v. Silverman</u>, 338 F.3d. 886, 901 (8th Cir. 2003) *quoting* <u>Friedrich v. Friedrich</u>, 78 F.3d. 1060, 1068 (6th Cir. 1996)("Friedrich II").

As noted previously, Respondent is asserting the "grave risk of harm" affirmative defense. This defense allows a court to deny the return of a child to his/her habitual residence if it is found that the return would expose the child to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation.  The Eighth Circuit has identified two (2) types of grave risk it considers reviewable under Article 13(b): sending a child to a "zone of war, famine or disease", or in cases of serious abuse or neglect (to the child).  <u>Silverman</u>, at 900;

<u>Antunez-Fernandes v. Connors-Fernandes</u>, 259 F.Supp.2d. 800, 815 (N.D.Iowa 2003)(*citing* <u>Silverman</u>, *supra.*).

Neither of these exceptions exist in this case. There is no dispute that New Zealand is not a "zone of war, famine or disease". As for Respondent's allegations of violence, as noted earlier, these allegations are highly suspect given that they are being raised for the first time before this Court. The credible evidence before this Court shows a father who has demonstrated great love and affection for his children, and has left no stone unturned to find them and seek their return to New Zealand. Petitioner's drug use has been and is a concern to the Court; however, he has testified under oath that he now maintains a drug-free home and has terminated his marijuana use. Furthermore, his prior drug use was outside of the home and not in front of the children; a fact that Respondent has failed to dispute with clear and convincing evidence. There is no credible evidence before the Court that Petitioner was abusive to or neglectful of the children. Whatever alleged abuse Petitioner directed to the Respondent was not directed to the children. The Court finds that the record does not demonstrate by clear and convincing evidence that the children would be exposed to a grave risk of harm if they were returned to New Zealand.

The Court is also mindful that the children have been separated from their father for a long period of time, and have been under the care of their mother and her family making the return to New Zealand a difficult decision for this Court. However, as the <u>Fernandes</u> district court noted,

> ". . . the grave harm exception does not give the court in the abducted-to country a license to speculate on where the children would be happiest; that decision is a custody matter and is reserved to the court in the country of habitual residence. `Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return. The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a `grave' risk of harm for the purposes of the Convention.'"

<u>Antunez-Fernandes</u>, at 816 (internal citations omitted).

The credible evidence before this Court establishes that Respondent removed the children K and B to The Netherlands, then to the United States in violation of the Hague Convention and that she has not proven, by clear and convincing evidence, that returning the children to New Zealand would expose either of the children to a grave risk of physical or psychological harm or otherwise place either child in an intolerable situation. The children must be returned to New Zealand forthwith.

## <u>ATTORNEYS' FEES AND COSTS</u>

Both the Hague Convention and ICARA provide for an award of attorneys' fees and costs to the person who is successful in obtaining the return of a child. Hague Convention, Article 26; 42 U.S.C. §11607(b)(3). In implementing Article 26, ICARA provides that:

> Any court ordering the return of a child pursuant to an
> action brought under section 11603 of this title shall order
> the respondent to pay necessary expenses incurred by or on
> behalf of the petitioner, including court costs, legal fees,
> foster home or other care during the course of proceedings
> in the action, and transportation costs related to the return
> of the child, unless the respondent establishes that such order
> would be clearly inappropriate."

42 U.S.C. §11607(b)(3). Under ICARA, the court must make the award, unless the respondent meets the burden of showing inappropriateness. *See*, <u>Feder v. Evans-Feder</u>, 63 F.3d. 217, 226 (3rd. Cir. 1995).

The Court will hold in abeyance its ruling as to the Petitioner's request for an award of fees and costs. Petitioner shall submit to the Court a full accounting of all attorneys' fees and costs subject to an award under the Hague Convention and ICARA. Respondent will be granted sufficient time to file any objections to this filing. The foregoing determination regarding the

children's return to New Zealand will not be delayed to address the issue of attorneys' fees and costs.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Petition for Return of Children under the Hague Convention (#1), filed June 11, 2007 be and is **GRANTED**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Summary Judgment (#16), filed July 24, 2007 be and is **GRANTED.**

**IT IS FURTHER ORDERED** that the children of Petitioner Papa Abdoul Selly Diallo and Respondent Melinda Marie Bekemeyer (n/k/a Melinda Marie Bumgardner), heretofore referred to as "K" and "B" shall be returned, on or before January 25, 2008, to New Zealand where a custody proceeding may be initiated by the parties.

**IT IS FURTHER ORDERED** that Petitioner shall immediately travel to the United States to facilitate the return of the children to New Zealand. Pursuant to his counsel's letter to the Court, dated August 30, 2007, Petitioner shall purchase airfare for himself and the children to return to New Zealand, subject to any reimbursement rights he may have under the Hague Convention and/or ICARA. Upon purchase of said airfare, Petitioner shall document same to the Court in order to retrieve the children's passports which are presently being held by the Court.

**IT IS FURTHER ORDERED** that Respondent is free to accompany the Petitioner and the children in returning to New Zealand; however such travel is solely at her expense. Whether or not Respondent chooses to return to New Zealand, the children shall return to New Zealand with the Petitioner. Respondent shall also turn over to Petitioner any necessary paperwork to facilitate the children's return to New Zealand.

**IT IS FURTHER ORDERED** that neither Respondent, nor anyone on her behalf, shall remove the two minor children from the Eastern District of Missouri, Eastern Division pending their return to New Zealand. If Respondent, or anyone on her behalf, does remove said children from this Court's geographical jurisdiction, severe sanctions shall be imposed, including but not limited to, arrest and incarceration for contempt of court. The Court will not hesitate in directing the United States Marshal Service to take physical custody of the children if this Court suspects that a risk of flight exists.

**IT IS FURTHER ORDERED** that Petitioner shall file, on or before January 25, 2008, a full accounting to substantiate his request for attorneys' fees and costs incurred and available pursuant to the Hague Convention and/or ICARA. Respondent shall have until February 15, 2008 to file any objections.

**IT IS FINALLY ORDERED** that this Court shall retain jurisdiction over this matter until such time the children are returned to New Zealand and the matter of attorneys' fees and costs is resolved.

Dated this ____28th____ day of December, 2007.

_____

SENIOR UNITED STATES DISTRICT JUDGE